A & M RECORDS, INC., a corporation; Geffen Records, Inc., a corporation; Interscope Records, a general partnership; Sony Music Entertainment, Inc., a corporation; MCA Records, Inc., a corporation; Atlantic Recording Corporation, a corporation; Island Records, Inc., a corporation; Motown Records Company L.P., a limited partnership; Capitol Records, a corporation; La Face Records, a joint venture; BMG Music d/b/a The RCA Records Label, a general partnership; Universal Records Inc., a corporation; Elektra Entertainment Group Inc., a corporation; Arista Records, Inc., a corporation; Sire Records Group, Inc., a corporation; Polygram Records, Inc., a corporation; Virgin Records America, Inc., a corporation; and Warner Bros. Records Inc., a corporation, Plaintiffs,

v.

NAPSTER, INC., a corporation, and Does 1–100, Defendants.

Jerry Leiber, individually and d/b/a Jerry Leiber Music; Mike Stoller, individually and d/b/a Mike Stoller Music; and Frank Music Corp., on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Napster, Inc., Defendant.

Nos. C 99–5183 MHP, C 00–0074 MHP.

United States District Court, N.D. California.

Aug. 10, 2000.

Russell J. Frackman, Jeffrey D. Goldman, George M. Borkowski, Drew E. Breuder, Mitchell Silberberg & Knupp, Los Angeles, CA, William M. Hart, Eric J. German, Frank P. Schibilia, Carla M. Miller, Hank L. Goldsmith, Leon P. Gold, Lawrence L. Weinstein, Proskauer Rose LLP, New York, NY, Hadrian R. Katz, Arnold & Porter, Washington, DC, Steven B. Fabrizio, Washington, DC, for Plaintiffs.

Lisa M. Arent, Melinda M. Morton, Michael A. Brille, Samuel A. Kaplan, William Jackson, Seth A. Goldberg, Fenwick & West LLP, Palo Alto, CA, Laurence F. Pulgram, Kathryn J. Fritz, Fenwick & West LLP, San Francisco, CA, David Boies, Boies Schiller & Flexner LLP, Armonk, NY, for Defendants.

Albert P. Bedecarre, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Palo Alto, CA, for amicus.

## OPINION

PATEL, Chief Judge.

The matter before the court concerns the boundary between sharing and theft, personal use and the unauthorized worldwide distribution of copyrighted music and sound recordings.[1] On December 6, 1999, A & M Records and seventeen other record companies ("record company plaintiffs") filed a complaint for contributory and vicarious copyright infringement, violations of the California Civil Code section 980(a)(2), and unfair competition against Napster, Inc.,[2] an Internet start-up that enables users to download MP3 music files without payment. On January 7, 2000, plaintiffs Jerry Leiber, Mike Stoller, and Frank Music Corporation filed a complaint for vicarious and contributory copyright infringement on behalf of a putative class of similarly-situated music publishers ("music publisher plaintiffs") against Napster, Inc. and former CEO Eileen Richardson. The music publisher plaintiffs filed a first amended complaint on April 6, 2000, and on May 24, 2000, the court entered a stipulation of dismissal of all claims against Richardson.[3] Now before this court is the record company and music publisher plaintiffs' joint motion to preliminarily enjoin Napster, Inc. from engaging in or assisting others in copying, downloading, uploading, transmitting, or distributing copyrighted music without the express permission of the rights owner.

In opposition to this motion, defendant seeks to expand the "fair use" doctrine

---

1. Hereafter, the court will use the term "music" to encompass both musical compositions and sound recordings, unless otherwise specifically noted.

2. For the sake of clarity, the court will refer to the defendant Internet company as "Napster, Inc." The term "Napster" will be used to denote Napster, Inc.'s integrated service, including but not limited to its software, servers, search functions, and indexing functions. Where "Napster" appears as an adjective, the aspect of the service to which the adjective refers should be clear from the context. The term "Napster user" refers to any individual who uses Napster software to download and/or upload files.

3. Although the parties sporadically include Eileen Richardson as a defendant in the caption, the court notes that she was dismissed from this action pursuant to the May 24, 2000 stipulation of dismissal.

articulated in *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), to encompass the massive downloading of MP3 files by Napster users. Alternatively, defendant contends that, even if this third-party activity constitutes direct copyright infringement, plaintiffs have not shown probable success on the merits of their contributory and vicarious infringement claims. Defendant also asks the court to find that copyright holders are not injured by a service created and promoted to facilitate the free downloading of music files, the vast majority of which are copyrighted.

Having considered the parties' arguments, the court grants plaintiffs' motion for a preliminary injunction against Napster, Inc. The court makes the following Findings of Fact and Conclusions of Law to support the preliminary injunction under Federal Rules of Civil Procedure 65(d).

## I. FINDINGS OF FACT

### A. *MP3 Technology*

1. Digital compression technology makes it possible to store audio recordings in a digital format that uses less memory and may be uploaded and downloaded over the Internet. *See* David M. Lisi Dec. (Tygar Rep.) at 11. MP3 is a popular, standard format used to store such compressed audio files. *See* Edward Kessler Dec. ¶ 3;[4] Lisi Dec. (Tygar Rep.) at 11. Compressing data into MP3 format results in some loss of sound quality. *See* List Dec. (Tygar Rep.) at 12. However, because MP3 files are smaller, they require less time to transfer and are therefore better suited to transmission over the Internet. *See id.* at 11.

2. Consumers typically acquire MP3 files in two ways. First, users may download audio recordings that have already been converted into MP3 format by using an Internet service such as Napster. *See* Lisi Dec. (Tygar Rep.) at 11. Second, "ripping" software makes it possible to copy an audio compact disc ("CD") directly onto a computer hard-drive; ripping software compresses the millions of bytes of information on a typical CD into a smaller MP3 file that requires a fraction of the storage space. *See id.;* Kessler Dec. ¶ 32; 1 Laurence F. Pulgram Dec., Exh. A (Conroy Dep.) at 13:19–24.

### B. *Defendant's Business*

1. Napster, Inc. is a start-up company based in San Mateo, California. It distributes its proprietary file-sharing software free of charge via its Internet website. People who have downloaded this software can log-on to the Napster system and share MP3 music files with other users who are also logged-on to the system. *See* Kessler Dec. ¶ 6. It is uncontradicted that Napster users currently upload or download MP3 files without payment to each other, defendant, or copyright owners.

According to a Napster, Inc. executive summary, the Napster service gives its users the unprecedented ability to "locate music by their favorite artists in MP3 format." 1 Frackman Dec., Exh. A (Richardson Dep.), Exh. 127 at ER000131.[5] Defen-

---

**4.** In this Memorandum and Order, the court will cite to and quote from any declaration, deposition, or other material filed under protective order if the parties relied upon it, or it is necessary to explain the court's findings and conclusions. Documents unsealed on this ground include: Russell Frackman Declaration (vols. 1 & 2), Kevin Conroy Declaration, Richard Cottrell Declaration, Mark Eisenberg Declaration, Lawrence Kenswil Declaration, Paul Vidich Declaration, David J. Teece Declaration, Edward Kessler Declaration, Laurence F. Pulgram Declaration (vols. 1 & 2), Daniel Farmer Declaration,

Russell Frackman Reply Declaration, Julia Greer Reply Declaration, and David Lambert Reply Declaration. This list includes any, or all, supporting exhibits that may contain internal company plans, deposition transcripts, or other material upon which the court has relied. Any other document formerly covered by protective order but cited in this *Memorandum and Order is also deemed to* be unsealed.

**5.** Defendant objects to this exhibit to former CEO Eileen Richardson's deposition on the grounds that it is neither properly authenti-

dant boasts that it "takes the frustration out of locating servers with MP3 files" by providing a peer-to-peer file-sharing system that allows Napster account holders to conduct relatively sophisticated searches for music files on the hard drives of millions of other anonymous users. *See A & M Records, Inc. v. Napster, Inc.*, 2000 WL 573136, at *1 (N.D.Cal. May 12, 2000) (citing Def.'s Mot. for Summ. Adjud.) at 4.

2. Although Napster was the brainchild of a college student who wanted to facilitate music-swapping by his roommate, *see* 1 Frackman Dec., Exh. B (Fanning Dep.) at 31:10–35:1, it is far from a simple tool of distribution among friends and family. According to defendant's internal documents, there will be 75 million Napster users by the end of 2000. *See* 1 Frackman Dec., Exh. A (Richardson Dep.) at 318:19–319:1, Exh. 166 at 002725. At one point, defendant estimated that even without marketing, its "viral service" was growing by more than 200 percent per month. *Id.*, Exh. 127 at ER00130. Approximately 10,000 music files are shared per second using Napster, and every second more than 100 users attempt to connect to the system. *See* Kessler Dec. ¶ 29.

3. Napster, Inc. currently collects no revenues and charges its clientele no fees; it is a free service. *See, e.g.,* 1 Frackman Dec., Exh. A (Richardson Dep.) at 179:15. However, it has never been a non-profit organization. *See id.* at 116:10. It plans to delay the maximization of revenues while it attracts a large user base. *See id.*, Exh. 127 at ER00130; 1 Frackman Dec., Exh. C (Parker Dep.) at 160:1–162:14, Exh. 254 at SF00099. The value of the system grows as the quantity and quality of available music increases. *See id.* at 112:18–113:2, Exh. 127 at ER00130; David

J. Teece Rep. at 4. Defendant's internal documents reveal a strategy of attaining a "critical mass" of music in an "ever-expanding library" as new members bring their MP3 collections online. *See* 1 Frackman Dec. (Richardson Dep.), Exh. 127 at ER00130; Exh. C (Parker Dep.) at 160:1–162:14, Exh. 254 at SF00099.

Defendant eventually plans to "monetize" its user base. *See id.* at 115:24–116:13; Teece Rep. at 4, 7–11. Potential revenue sources include targeted email; advertising; commissions from links to commercial websites; and direct marketing of CDs, Napster products, and CD burners and rippers. *See* 1 Frackman Dec., Exh. C (Parker Dep.) at 160:1–162:14, Exh. 254 at SF00099–100; Teece Rep. at 2–3. Defendant also may begin to charge fees for a premium or commercial version of its software. *See* Teece Rep. at 8; *cf.* 1 Frackman Dec., Exh. A (Richardson Dep.) at 179:6–25. The existence of a large user base that increases daily and can be "monetized" makes Napster, Inc. a potentially attractive acquisition for larger, more established firms. *See* Teece Rep. at 7.

4. Napster Inc.'s value—which is measured, at least in part, by the size of its user base—lies between 60 and 80 million dollars. *See* Teece Rep. at 11–12; Def.'s Opp. at 35. Defendant obtained substantial capital infusions after the onset of this litigation. For example, in May 2000, the venture firm Hummer Winblad purchased a twenty-percent ownership interest in the company for 13 million dollars; other investors simultaneously invested 1.5 million dollars. *See* Hank Barry Dec. ¶ 7.

5. The evidence shows that virtually all Napster users download or upload copy-

cated nor "relevant to Napster work today." Def's Objections to Pl.'s Evidence at 10. The court does not intend to rule directly on each of defendant's myriad objections, many of which are unfounded; however, it notes that Richardson testified that she reviewed this document and that it dated from October 1999. She confirmed much of its content under oath, and defendant's counsel failed to

object to the document during the deposition on relevancy, foundational, or authentication grounds. Defendant's early business plans are relevant to this action because they reveal facts about the early operation of the Napster service, as well as the knowledge and goals of Napster, Inc. executives. Accordingly, Exhibit 127 to the Richardson Deposition is admissible.

righted files and that the vast majority of the music available on Napster is copyrighted. Eighty-seven percent of the files sampled by plaintiffs' expert, Dr. Ingram Olkin, "belong to or are administered by plaintiffs or other copyright holders." [6] Olkin Rep. at 7. After analyzing Olkin's data, Charles J. Hausman, anti-piracy counsel for the RIAA, determined that 834 out of 1,150 files in Olkin's download database belong to or are administered by plaintiffs; plaintiffs alone own the copyrights to more than seventy percent of the 1,150 files. *See* Charles J. Hausman Dec. ¶ 8. Napster users shared these files without authorization. *See id.*

6. Napster, Inc. has never obtained licenses to distribute or download, or to facilitate others in distributing or downloading, the music that plaintiffs own. *See* Kevin Conroy Dec. ¶ 4; Richard Cottrell Dec. ¶ 5; Mark R. Eisenberg Dec. ¶ 21; Lawrence Kenswil Dec. ¶ 15; Paul Vidich Dec. ¶ 8; Mike Stoller Dec. ¶ 11.

7. Defendant's internal documents indicate that it seeks to take over, or at least threaten, plaintiffs' role in the promotion and distribution of music. *See, e.g.,* 1 Frackman Dec., Exh. C (Parker Dep.), 160:1–162:14, Exh. 254, at SF00099 (declaring that "[u]ltimately Napster could evolve into a full-fledged music distribution platform, usurping the record industry as we know it today and allowing us to digitally promote and distribute emerging artists at a fraction of the cost" but noting that "we should focus on our realistic short-term goals while wooing the industry before we try to undermine it").[7]

8. Defendant's internal documents also demonstrate that its executives knew Napster users were engaging in unauthorized downloading and uploading of copyrighted music. *See, e.g.* 1 Frackman Dec., Exh. C (Parker Dep.) at 160:1–162:14, Exh. 254 at SF00100 (stating that Napster users "are exchanging *pirated* music."); *id.* at SF00102 ("[W]e are not just making *pirated* music available but also pushing demand"). Several Napster executives admitted in their depositions that they believed many of the millions of MP3 music files available on Napster were copyright-

---

**6.** Plaintiffs' expert Dr. Ingram Olkin, a professor of statistics at Stanford University, divided his study into two projects. In the User Project, a sample list of users and file names was taken every hour for four days. Researchers culled a random sub-sample of 1,150 users from 28,000 sampled and determined that all 1,150 users offered to share at least two copyrighted songs. *See id.* at 4–5, 7. The Download Project performed downloads at eight separate times for a five-minute period and generated a list of 1,150 songs from a population of approximately 574, 185 files. *See id.* at 6. Olkin found that plaintiffs or other copyright holders own or administer the rights to 1,002 (or 87.1 percent) of the 1,150 files. Thirty-seven (or 3.2 percent) of the files are likely to copyrighted and distributed without authorization. Dr. Olkin identified only three files (or .26 percent) which were clearly offered without objection from the rights holder, while 108 (or 9.4 percent) of the files did not present enough data to yield a conclusion. *See id.* at 7. Charles J. Hausman, anti-piracy counsel for the RIAA, determined that 834 out of 1,150 files in Olkin's download database belonged to or were administered by plaintiffs and were exchanged on Napster without permission. *See* Charles J. Hausman Dec. ¶ 8.

**7.** Defendant's objection to Exhibit 254 of the Parker Deposition exemplifies a strategy, in which both parties have engaged, of indiscriminately challenging unfavorable evidence. This approach is both fruitless and burdensome for the court. Defendant characterizes Exhibit 254 as irrelevant to how the company "actually operates;" yet the early business strategies of Napster, Inc. are plainly relevant to such issues as defendant's knowledge of the infringing activity and its intended effect on the market.

While defendant raises many meritless objections, it also correctly notes that plaintiffs failed to authenticate some of the documents upon which they rely. For example, plaintiffs did not get Shawn Fanning to authenticate Exhibits 186 and 188 to his deposition. They have paid a price for this oversight. The court cannot rely on documents that would otherwise be "smoking guns" indicating that Napster, Inc. sought to "bypass the record industry entirely," make record stores obsolete, and "bring[ ] about the death of the CD." 1 Frackman Dec. (Fanning Dep.), Exh. 186 at 00017; Exh. 188.

ed. *See, e.g.,* 1 Frackman Dec., Exh. B (Fanning Dep.) at 105:10–108:2.

9. At least on paper, the promotion of new artists constituted an aspect of defendant's plan as early as October 1999. *See* Sean F. Parker Dec. ¶ 5 & Exh. B [8]; Scott Krause Dec. ¶ 6. New or unsigned artists now may promote their works and distribute them in MP3 format via the Napster service. *See* Krause Dec. ¶¶ 8–15. Napster, Inc. has sought business alliances and developed both Internet- and software-based technologies to support its New Artist Program. *See* Parker Dec. ¶ 6.

However, the court finds that the New Artist Program accounts for a small portion of Napster use and did not become central to defendant's business strategy until this action made it convenient to give the program top billing. An early version of the Napster website advertised the ease with which users could find their favorite popular music without "wading through page after page of unknown artists." 1 Frackman Dec., Exh. C (Parker Dep.) at 104:16–105:10, Exh. 235. Defendant did not even create the New Artist Program that runs on its Internet website until April 2000—well after plaintiffs filed this action.[9] *See* Krause Dec. ¶ 9, Exh. A.

Moreover, in Olkin's sample of 1,150 files (which were randomly selected from over 550,000), only 232 files matched *any* of the 19,440 names that were listed in defendant's new artist database as of July 2000. *See* Olkin Reply Dec. ¶¶ 3–5; Hausman Reply Dec. ¶¶ 3–6. An RIAA representative who analyzed the data also noted that the list of so-called new artists actually contained many popular stars represented by major record labels—among them teen sensation Britney Spears and the legendary alternative rock band Nirvana. *See* Hausman Reply Dec. ¶ 5. Once established artists were eliminated from the results, only eleven new artists and fourteen of their music files remained in Olkin's sample of 1,150 files. *See id.* ¶ 6.

10. Defendant employs the term "space-shifting" to refer to the process of converting a CD the consumer already owns into MP3 format and using Napster to transfer the music to a different computer—from home to office, for example.[10] *See* Def. Opp. at 12. The court finds that space-shifting accounts for a *de minimis* portion of Napster use and is not a significant aspect of defendant's business. According to the court's understanding of the Napster technology, a user who wanted to space-shift files from her home to her office would have to log-on to the system from her home computer, leave that computer online, commute to work, and log-on

---

8. Sean Parker appears to have mistakenly identified this document, numbered NAP003687—an October 28, 1999 email from Stephanie Norton to other Napster employees, including Parker—as Exhibit A to his declaration. In fact, it is Exhibit B. Although the email indicates that defendant planned to solicit interest among unsigned artists, it contains a cryptic statement regarding the creation of indexes listing available MP3s: "For now, we should do this for UNSIGNED artists only so the RIAA *thinks* we are not infringing on copyright." Parker Dec., Exh. B (second emphasis added). As is often the case with defendant's internal documents, whether defendant viewed the promotion of new artists as a genuine goal or a smokescreen remains ambiguous.

9. *See infra* at section (C)(12) of the Findings of Fact for a description of the two aspects of defendant's New Artist Program—a website version and a software-based version.

10. Defendant also provides an audio player capable of playing MP3 files on a user's hard drive, regardless of how those files were obtained. *See* Edward Kessler Reply Dec. in Support of Def.'s Mot. for Summ. Adjud. ¶ 29. Neither party has briefed the function of the audio player in support of its position on the necessity of a preliminary injunction. However, the player has little or no connection to the alleged copying that occurs when Napster users upload or download music and, hence, is not relevant to the requested relief. *See id.* While a consumer might rip CDs and then play the resultant MP3 files on the Napster player, the court rejects any suggestion that this activity constitutes a substantial, non-infringing use of Napster for the same reasons it dismisses defendant' argument about space-shifting from home to office. The court also notes that, because the audio player can only play music files which a user already possesses, it cannot be used for sampling.

to Napster from her office computer to access the desired file. In the meantime, many users might download it before she reached the office. Common sense dictates that this use does not draw users lo the system. Defendant fails to cite a single Napster, Inc. document indicating that the company saw space-shifting as an attraction for its user base, and survey evidence shows that almost half of college-student survey respondents previously owned less than ten percent of the songs they have downloaded. *See* E. Deborah Jay Rep. at 4, 21 & Tbl. 7.

### C. *The Napster Technology*

1. Internet users may download defendant's proprietary MusicShare software free of charge from the Napster website. This free software enables users to access the Napster computer network. *See* Kessler Dec. ¶ 6.

2. The software becomes fully functional after users register with Napster by selecting an account name, or "user name," and a password. *See* Kessler Dec. ¶¶ 6, 23. Persons who register may include biographical data, but registration does not require a real name or address. *See* 2 Frackman Dec., Exh. E (Kessler Dep.) at 255:20–257:22. Napster does not associate user names with the biographical information that individuals provide at registration. *See id.* Indeed, after a user logs-on, her physical address information is no longer available to the Napster server. *See id.*

3. The software features a browser interface, search engine, and chat functions that operate in conjunction with defendant's online network of servers. *See id.* ¶¶ 6, 13. The software also contains a "hotlist" tool that allows users to compile and store lists of other account holders' user names. *See id.* ¶ 8. In addition, the Napster software may be used to play and categorize audio files, which users can store in specific file directories on their hard drives. *See id.* ¶¶ 6–7. Those directories, which allow account holders to share files on Napster, constitute the "user library." *Id.* Some users store their MP3

files in such directories; others do not. *See id.*

4. Defendant maintains clusters of servers that compose its network or system. *See* Kessler Dec. ¶ 13. Account holders who access the Napster network may communicate, share files, and learn of designated hotlist names only within the cluster to which they are assigned. *See id.* Users can access the network of servers free of charge.

5. Once an account holder signs on to the Napster network, the Napster browser interacts with its proprietary server-side software. *See id.* ¶¶ 7, 8; 2 Frackman Dec., Exh. E (Kessler Dep.) at 54:16–56:10. If a user sets the "allowable uploads" function of the MusicShare software above zero, all of the MP3 file names she stores in her user library automatically become available to other online Napster users. *See* Kessler Dec. ¶ 7.

However, before the client software uploads MP3 file names to defendant's master servers, it "validates" the files stored in the user library directories. *See* 2 Frackman Dec., Exh. E (Kessler Dep.) at 145:2–18. The client software reads those files to ensure they are indeed MP3 files, checking to see whether they contain the proper syntax specification and content. *See id.* If the files are not properly formatted, their file names will not be not uploaded to the Napster servers. *See id.*

Once the file names are successfully uploaded to the servers, each user library, identified by a user name, becomes a "location" on the servers. Kessler Dec. ¶ 8. Napster locations are short-lived; they are respectively added or purged every time a user signs on or off of the network. *See id.* Thus, a user's MP3 files are only accessible to other users while she is online.

6. A user who is logged-on to the Napster servers via the client software may access the content of other users' uploaded "locations" in one of two ways: (a) by utilizing defendant's proprietary search en-

gine, or (b) by employing the hotlist tool featured in the client software. *See id.* ¶ 12.

7. An account holder may use the search tools included in the Napster client software to find MP3 files. *See id.* ¶ 10. The server-side application software maintains a search index that is updated in real time as users log-on and -off of the system. *See id.;* 2 Frackman Dec., Exh. E (Kessler Dep.) at 56:3–10. The file-name index contains the names of MP3 files that on-line users save in their designated user library directories. *See* Kessler Dec. ¶¶ 7, 14; 2 Frackman Dec., Exh. E (Kessler Dep.) at 55:14–56:10; Exh. 2. Users who wish to search for a song or artist may do so by entering the name of the song or artist in the search fields of the client software and then clicking the "Find It" button. When the search form is transmitted to the Napster network, the Napster servers send the requesting user a list of files that include the same term(s) she entered on the search form. *See* Kessler Dec. ¶ 5; 2 Frackman Dec., Exh. E (Kessler Dep.) at 56:3–10.

After the application software returns a list of specific MP3 file names to the requesting user, the user then must peruse the list to determine whether she desires any of those files. *See id.* ¶ 10. She must read through the list because the Napster application software does not search for a particular song or recording artist *per se.* Napster does not organize MP3 files based on content because, currently, they are not designed for such indexing. *See id.* ¶ 11. Instead, Napster performs a text search of the file names indexed in a particular cluster. Those file names may contain typographical errors or otherwise inaccurate descriptions of the content of the files since they are designated by other users. *See id.* ¶¶ 13, 10, 27; 2 Pulgram Dec. Exh. B (Fanning Dep.) at 116:8–19.

In addition to listed text results from an executed search, Napster's servers provide other information about particular MP3 files. For instance, the client software can sort the results of "echo packets" or "ping requests" that it sends out to host users; these requests help gauge the "responsiveness value" of a transmission between two users by. calculating the amount of time it takes for ping responses to be returned to the client software. *See* 2 Frackman Dec., Exh. E (Kessler Dep.) at 56:3–10, Exh. 5 at 3; Shawn Fanning Dec. ¶ 8. Users can also search for files that meet certain technical criteria, such as the host user's bandwidth. *See id.* Finally, the file name or "data object description" includes the size and bytes stored and "attributes of quality," such as bit rate. *See* 2 Frackman Dec., Exh. E (Kessler Dep.) at 153:16–154:24; Fanning Dec. ¶ 8. These Napster options contribute to the ease with which the user can locate and obtain the music she wants.

8. Alternatively, users may access MP3 files via the hotlist function. This function enables a Napster user to archive other user names and learn whether account holders who access the network under those names are online. *See* Kessler Dec. ¶¶ 8–9. A requesting user can access or browse all files listed in the user libraries of hotlisted users. *See id.* ¶ 9. Then she can request a particular file in a host user's user library by selecting, or clicking on, that file name. *See id.* The hotlist function is a feature that helps make Napster users a virtual community—they are not only able to download the music they desire, but also to obtain files from particular individuals whom they know by user name.

9. The Napster network facilitates the same mode of file-transfer, whether a requesting user accesses a specific MP3 file with the search engine or the hotlist. *See id.* ¶ 12. Once a requesting user locates and selects the file she wishes to download, the server-side software engages in a dialogue with her browser and that of the "host user" (that is, the user who makes the MP3 available for downloading). *See* Kessler Dec. ¶ 12; 2 Frackman Dec., Exh. E (Kessler Dep.) at 80:19–22; 56:3–10. Napster servers obtain the necessary IP

address information from the host user. *See* Daniel Farmer Dec. ¶ 17; Frackman Dec., Exh. 1 (Kessler Dep.) at 103–05. The servers then communicate the host user's address or routing information to the requesting user; the requesting user's computer employs this information to establish a connection with the host user's browser software and download the MP3 file from the host user's library. *See* Kessler Dec. ¶¶ 10–13; 2 Frackman Dec., Exh. E (Kessler Dep.) at 56:3–10. The content of the actual MP3 file is transferred over the Internet between users, not through the Napster servers. *See* Kessler Dec. ¶ 12; *A & M Records, Inc. v. Napster, Inc.,* 2000 WL 573136, at *7 (N.D.Cal. May 12, 2000). However, users would not be able to access the uploaded file names and corresponding routing data without signing on to the Napster system. *See* Kessler Dec. ¶ 23.

10. In some instances, a requested file is not immediately ready for download. Those files are "queued" or deferred until the host user is able to transmit the file. *See* 2 Frackman Dec., Exh. E (Kessler Dep. at 80:2–22). The request may be deferred, for example, because the host user has limited the number of downloads she can provide simultaneously, or because the host user has signed off the Napster network. *See id.*

Defendant employs technology that permits users to resume queued downloads at a later time. *See* 2 Frackman Dec., Exh. E (Kessler Dep.) at 112:3–13. Every MP3 file has a mathematically-generated and unique fingerprint or "checksum." *See* Kessler Dec. ¶ 32; 2 Frackman Dec., Exh. E (Kessler Dep.) at 112:3–13. Any requesting user who is unable to download a particular MP3 file may use the client software to send the file's checksum and full intended size to the Napster servers and attempt to locate a match for download. *See* 2 Frackman Dec., Exh. E (Kessler Dep.) at 112:3–13.

11. Defendant also provides Napster users with a chat service. Its central servers permit users who are logged-on to communicate with other online users, including those whose user names comprise the hotlist. *See* Kessler Dec. ¶ 13. Aside from communicating with specific online users logged-on to the same cluster of servers, the chat service allows users to communicate in groups. Defendant organizes these groups within "channels" or "chat rooms" named after particular musical genres. *See id.;* 2 Pulgram Dec., Exh. B (2 Fanning Dep.) at 219: 4–14. Alternatively, users can create their own channels in which to communicate. *See* Kessler Dec. ¶ 13.

12. Defendant's New Artist Program technology functions in two interrelated environments: (a) on its Internet website and (b) through its network-client browser and search technology. *See* Krause Dec. ¶¶ 9–15. The website version performs several functions. It allows new or unsigned artists to create a "profile" that consists of certain biographical and descriptive data including artist and band names, similar artists or influences, and news about the band. *See id.* ¶¶ 9–10, Exh. C. Defendant only accepts completed forms if the submitting artist authorizes Napster users to share his music. *See id.* ¶ 10, Exh. D. Once defendant accepts the profile, it stores all of the relevant information in a database linked to its Internet website. *See id.* ¶ 11. Defendant has accepted several thousand such profiles. *See id.* ¶¶ 9, 16.

Members of the public can then search the new artist database in several ways: (1) by artist name, (2) by artist influence, or (3) by browsing the different genres of music and then scrolling down lists of new artists categorized in those genres. *See id.* ¶ 12. The Napster site does not store any of the new artists' music, however. *See id.* ¶ 9. Instead, those who access the website-based service acquire information about an artist, such as his name. *See id.,* Exh. E. Once an individual obtains this data, she is directed to switch to Napster's software- and network-based service to

search for and download the new artist's music. *See id.* ¶ 15.

Napster account holders who use MusicShare software and log-on to the Napster system can locate and download new artists' songs in the same manner they would find and download any other files: by utilizing the search engine, or by browsing user libraries. *See id.* ¶ 9. While on the Napster network, both new artists and other users may use the chat function to market music directly or learn about new artists. *See id.* ¶¶ 8, 15.

### D. *Plaintiffs' Business*

1. The music publisher plaintiffs compose music and write songs. *See, e.g.,* Stoller Dec. ¶ 2. They depend financially upon the sale of sound recordings because they earn royalties from such sales. *See id.* at ¶¶ 2, 11, 13. However, they do not get a royalty when a Napster user uploads or downloads an MP3 file of their compositions without payment or authorization. *See id.* ¶ 11. The record company plaintiffs' sound recordings also result from a substantial investment of money, time, manpower, and creativity. *See* Conroy Dec. ¶ 5; Cottrell Dec. 5; Eisenberg Dec. ¶¶ 5, 21; Kenswil Dec. ¶ 5.

In contrast, defendant invests nothing in the content of the music which means that, compared with plaintiffs, it incurs virtually no costs in providing a wide array of music to satisfy consumer demand. *See* Teece Rep. at 14.

2. To make a profit, the record company plaintiffs largely rely on the success of "hit" or popular recordings, which may constitute as little as ten or fifteen percent of albums released. *See, e.g.,* Eisenberg Dec. ¶ 7. Many, or all, of their top recordings have been available for free on Napster. *See* Frank Creighton Dec. ¶ 5.

3. The record company plaintiffs have invested substantial time, effort, and funds in actual or planned entry into the digital downloading market. BMG Music ("BMG")[11] began to explore digital down-

loading in early 1996 and has made more than twenty tracks commercially available for downloading through the digital service providers ("DSPs") Amplified.com and the Liquid Music Network. *See* Conroy Dec. ¶ 9. BMG has entered several business partnerships, strategic marketing agreements, and clearinghouse relationships to develop a plan for secure, commercial digital downloading; July 2000 was the target date for BMG's launch. *See id.* at ¶¶ 10–17.

Plaintiffs Capitol Record, Inc. and Virgin Records America are affiliated with EMI Recorded Music, North America ("EMI"). *See* Cottrell Dec. ¶ 1. EMI has developed business plans to distribute its music through several DSPs which represent more than 800 retail websites. *See id.* ¶ 7. All digital downloads that EMI offers will be encrypted and watermarked. *See id.* ¶ 12.

Sony Music Entertainment ("Sony") has already begun to make selected singles available through its websites and those of its artists; to obtain a permanent copy of this music, consumers must pay for the download. *See* Eisenberg Dec. ¶ 13. As of May 31, 2000, Sony also began selling downloadable music through a distribution network of about thirty-five retail sites. *See id.* at ¶ 17.

Plaintiffs A & M Records, Geffen Records, Interscope Records, Island Records, MCA Records, Motown Records, UMG Records, and Universal Records (collectively, "Universal") have spent millions of dollars preparing a secure digital distribution system scheduled for launch in mid-summer 2000. *See* Kenswil Dec. ¶ 9–16.

Warner Music Group and its associated labels—plaintiffs Atlantic Recording Corp., London–Sire Records Inc. (f/k/a Sire Records Group Inc.), Elektra Entertainment Group Inc., and Warner Bros. Records (collectively, "Warner")—have done due diligence and dedicated a substantial budget to digital distribution. *See* Vidich Dec.

---

**11.** BMG's labels include plaintiffs Arista Records, LaFace Records, and RCA Records. *See* Conroy Dec. ¶ 1. BMG Music is also a plaintiff in this action.

¶ 7(a)–(e). Warner expects to launch its commercial digital distribution of hundreds of recordings by the fourth quarter of 2000. *See id.* at ¶ 7(e)

4. Promotional samples offered by plaintiffs and other retail sites differ significantly from using Napster to decide whether to buy a CD. The record company plaintiffs have made some free downloads available but have limited them in amount and duration. They have not provided entire albums, and the downloads typically have been "timed-out" so that users can only play them for a finite period of time—often less than a month. *See* Conroy Dec. ¶ 9–17; Cottrell Dec. ¶ 15; Eisenberg Dec. ¶ 13; Kenswil Dec. ¶ 12; Vidich Dec. ¶¶ 7(d), 8. Although plaintiffs have not been completely successful in managing the rights to promotional downloads, record company executives accord importance to the security of music distributed in this manner.[12] *See* Conroy Dec. ¶ 9–17; Cottrell Dec. ¶ 15; Eisenberg Dec. ¶ 13; Kenswil Dec. ¶ 12; Vidich Dec. ¶¶ 7(d), 8.

Retail sites, such as Amazon.com, offer thirty-to-sixty-second song samples in streaming audio format, rather than as downloads. *See* David Lambert Reply Dec. ¶ 2. Unlike downloading, streaming does not copy the music onto the listener's computer hard drive; it merely allows her to hear it. *See id.* Because companies like DiscoverMusic that provide song samples to these Internet retailers enter licensing agreements, rights holders earn royalties from this form of sampling. *See id.* ¶ 3.

In contrast, persons who obtain MP3 files for free using Napster can retain and play them indefinitely—and, even if they download a song to make a purchasing decision, they may decide *not* to buy the music. While Napster users can burn CDs comprised of unauthorized downloads they obtained to "sample" new songs, sampling on sites affiliated with plaintiffs does not substitute for purchasing the entire disc. *See* Teece Rep. at 17.

E. *Effect of Napster on the Market for Plaintiffs' Copyrighted Works*

1. The court finds that Napster use is likely to reduce CD purchases by college students, whom defendant admits constitute a key demographic. *See* Jay Rep. at 4, 18; Michael Fine Rep. at 1; Julia Greer Reply Dec. (Brooks Dep.) at 145:10–12 ("We believes [sic] ourselves to have a high college demographic, and beyond that to be primarily [ages] 12 to 24."). Plaintiffs' expert, Dr. E. Deborah Jay, opined that forty-one percent of her college-student survey respondents "gave a reason for using Napster or described the nature of its impact on their music purchases in a way which either explicitly indicated or suggested that Napster displaces CD sales." Jay Rep. at 4, 18. She also found that twenty-one percent of the college students surveyed revealed that Napster helped them make a better selection or decide what to buy. *See id.,* Tbl. 4. However, Jay's overall conclusion was that "[t]he more songs Napster users have downloaded," the more likely they are to admit or imply that such use has reduced their music purchases. *See id.* at 4, 18. The report of Soundscan CEO Michael Fine lends support to Jay's findings. After examining data culled from three types of retail stores near college or university campuses,[13] Fine concluded that "on-line

---

12. If such music is not protected technologically, an individual consumer may become a worldwide distributor of copyrighted material after obtaining a single, promotional copy in digital format. *See* Teece Rep. at 13.

13. Fine's study tracked retail music sales trends in three types of stores in the United States: (1) all stores located within one mile of any college or university on a list acquired from Quality Education Data; (2) all stores located within one mile of any college or university on a list of colleges and universities that have banned Napster use; (3) all stores within one mile of any college or university listed among the "Top 40 Most Wired Colleges in 1999," according to Yahoo Internet Life. Researchers working on the Fine Report used Soundscan Point of Sale data to compare music sales totals from the latter two categories with (1) national totals and (2) sales from the first category, "All College Stores." The report tracked retail sales in the

file sharing has resulted in a loss of album sales within college markets."[14] Fine Rep. at 1.

For the reasons discussed in the court's separate order, the report by defendant's expert, Dr. Peter S. Fader, does not provide credible evidence that music file-sharing on Napster stimulates more CD sales than it displaces.[15] Nor do the recording industry documents that defendant cites reliably show increased music sales due to Napster use. One such memorandum deals with the effect of Warner's promotional downloads, which are "timed-out" and thus differ from MP3 files obtained using Napster. *See* 1 Pulgram Dec., Exh. N (Vidich Dep.), Exh. 279 at T3122–23; Vidich Dec. ¶¶ 7(d), 8 (stating that free, promotional downloads are "timed-out."). Another purported "smoking gun" is a Universal survey on music-purchasing by people who download MP3 files. *See* 1 Pulgram Dec., Exh. F (Kenswil Dep.) at 110:22–111:15. However, the court has too little information about this survey to rely on it, and the deponent, Universal representative Lawrence Kenswil, declined to vouch for the survey's accuracy. *See id.* at 111:8, 14–15.

2. Because plaintiffs entered the digital download market very recently, or plan to enter it in the next few months, they are especially vulnerable to direct competition from Napster, Inc. *See* Teece Rep. at 15–16. The court finds that, in choosing between the free Napster service and pay-per-download sites, consumers are likely to choose Napster. *See id.* at 14; Jay Rep. at 4, 18 (reaching this conclusion with regard to a survey sample of college students).

Defendant's economic expert, Dr. Robert E. Hall, opines that plaintiffs' music could still command a high price after a period when the price has been zero due to Napster use; thus, he concludes, plaintiffs will not suffer irreparable harm between now and a trial verdict against defendant. *See* Lisi Dec. (Hall Rep.) ¶¶ 39, 54. This argument does not square with Hall's assertion that preliminarily enjoining defendant will put it out of business because users will switch to services offered by "kindred spirits." Hall Rep. ¶ 15–19, 73; *see also* Barry Dec. ¶ 13. If this is true, consumers will not necessarily resume *buying* music if Napster is enjoined; rather, they will go to other sites offering free MP3 files.[16] Indeed, as Dr. David J. Teece avers, defendant has contributed to a new attitude that digitally-downloaded songs ought to be free—an attitude that creates formidable hurdles for the establishment

first quarter ("Q1") of 1997, 1998, 1999, and 2000. *See* Fine Rep. at 2–4.

14. Fine's conclusions were not limited to Napster, but rather assessed the effects of online music file-sharing in general. *See id.* While national sales grew "significantly and consistently" in the quarters Fine studied, sales at stores near colleges or universities declined, with sales in the "Top 40 Most Wired Colleges" and "Napster-banned" subsets showing an even sharper decline than those in the "All College Stores" category. *See id.*

The court has noted the limitations of the Jay and Fine Reports in its separate order regarding the admissibility of expert opinions. Despite flaws in each report, the court relies on Jay's insights into the music purchasing and downloading habits of college students, as opposed to all Napster users, and considers the Fine Report relevant to corroborate Jay's findings.

15. The court's memorandum and order regarding the admissibility of expert reports includes a detailed discussion of flaws in the Fader Report. Among the shortcomings the court noted are Fader's heavy reliance on journalistic articles and studies that he did not conduct, the fact the centerpiece of his report is a survey that he only distantly supervised, and the lack of tables offering statistical breakdowns of survey respondents and their answers.

16. The availability of free MP3 music files elsewhere in cyberspace means that enjoining Napster fails to provide a complete panacea for plaintiffs' problems. However, arguing that third-parties also facilitate unlawful activity does not constitute valid defense to claims of contributory and vicarious copyright infringement.

of a commercial downloading market. *See* Teece Rep. at 14–18.

Hall also maintains that Napster, Inc. will increase the volume of plaintiffs' online sales by stimulating consumer investment in the hardware and software needed to obtain and play MP3 files. *See* Hall Rep. ¶¶ 45–49. However, he ignores evidence of reduced CD-buying among college students due to Napster use, *see* Jay Rep. at 18, and the data upon which he relies to argue that Napster has enhanced sales is either weak (in the case of the Fader Report) or unavailable for the court's review. *See, e.g., id.* ¶ 17 (relying on IDC and Forrester Research studies), ¶¶ 27–28 (discussing reports by Student Monitor and Andersen Consulting), ¶ 34 (citing a study by the University of Southern California). The court therefore finds that the barriers to commercial distribution posed by an emerging sense of entitlement to free music probably outweigh the benefits that defendant purports to confer.

3. Downloading on Napster also has the potential to disrupt plaintiffs' promotional efforts because it does not involve any of the restrictions on timing, amount, or selection that plaintiffs impose when they offer free music files. *See* Conroy Dec. ¶ 19–17; Cottrell Dec. ¶ 15; Eisenberg Dec. ¶ 13; Kenswil Dec. ¶ 12; Vidich Dec. ¶¶ 7(d), 8; *see also* Teece Rep. at 18. Even if Napster users sometimes download files to determine whether they want to purchase a CD, sampling on Napster is vastly different than that offered by plaintiffs. On Napster, the user—not the copyright owner—determines how much music to sample and how long to keep it.

## II. CONCLUSIONS OF LAW

### A. *Legal Standard*

■ 1. The Ninth Circuit authorizes preliminary injunctive relief for "a party who demonstrates either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) that serious questions are raised and the balance of hardships tips in its favor." *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.,* 204 F.3d 867, 874 (9th Cir. 2000).

■ 2. The standard is a sliding scale which requires a greater degree of harm the lesser the probability of success. *See id.* In a copyright infringement case, demonstration of a reasonable likelihood of success on the merits creates a presumption of irreparable harm.[17] *See Micro Star v. Formgen, Inc.,* 154 F.3d 1107, 1109 (9th Cir.1998).

### B. *Proof of Direct Infringement*

■ 1. To prevail on a contributory or vicarious copyright infringement claim, a plaintiff must show direct infringement by a third party. *See Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 434, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). As a threshold matter, plaintiffs in this action must demonstrate that Napster users are engaged in direct infringement.

■ 2. Plaintiffs have established a prima facie case of direct copyright infringement. As discussed above, virtually all Napster users engage in the unauthorized downloading or uploading of copyrighted music; as much as eighty-seven percent of the files available on Napster may be copyrighted, and more than seventy percent may be owned or administered by plaintiffs. *See* Olkin Rep. at 7; Hausman Dec. ¶ 8.

---

**17.** Defendant cites *Cadence Design Systems, Inc. v. Avant! Corp.,* 125 F.3d 824, 829 (9th Cir.1997), *cert. denied,* 523 U.S. 1118, 118 S.Ct. 1795, 140 L.Ed.2d 936 (1998), for the proposition that showing a plaintiff has suffered no injury, or *de minimis* injury, rebuts the presumption of irreparable harm. Such language in *Cadence* constitutes pure dicta. Moreover, the passage from *Nimmer on Copy-* right to which the *Cadence* court refers deals with defeating an allegation of substantial similarity by demonstrating that the amount of copying was *de minimis.* Defendant does not suggest that downloading entire copyrighted songs is *de minimis* copying, but rather that obtaining music using Napster does not displace CD sales. *See* Def's Opp. at 29.

C. *Affirmative Defense of Fair Use and Substantial Non–Infringing Use*

■ 1. Defendant asserts the affirmative defenses of fair use and substantial non-infringing use. The latter defense is also known as the staple article of commerce doctrine. *See Sony*, 464 U.S. at 442, 104 S.Ct. 774. *Sony* stands for the rule that a manufacturer is not liable for selling a "staple article of commerce" that is "capable of commercially significant non-infringing uses." *Id.* The Supreme Court also declared in *Sony*, "Any individual may reproduce a copyrighted work for a 'fair use'; the copyright holder does not possess the exclusive right to such a use." *Id.* at 433, 104 S.Ct. 774. Defendant bears the burden of proving these affirmative defenses. *See Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1542 n. 22 (11th Cir.1996) ("[I]t is clear the burden of proving fair use is always on the putative infringer.").

2. For the reasons set forth below, the court finds that any potential non-infringing use of the Napster service is minimal or connected to the infringing activity, or both. The substantial or commercially significant use of the service was, and continues to be, the unauthorized downloading and uploading of popular music, most of which is copyrighted.

■ 3. Section 107 of the Copyright Act provides a non-exhaustive list of fair use factors. These factors include:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
(2) the nature of the copyrighted work;
(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

4. In the instant action, the purpose and character of the use militates against a finding of fair use. Ascertaining whether the new work transforms the copyrighted material satisfies the main goal of the first factor. *See Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 579, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994). Plaintiff persuasively argues that downloading MP3 files does not transform the copyrighted music. *See UMG Recordings, Inc. v. MP3.Com, Inc.*, 92 F.Supp.2d 349, 351 (S.D.N.Y.2000) (concluding that repackaging copyrighted recordings in MP3 format suitable for downloading "adds no 'new aesthetics, new insights and understandings' to the original").

■ 5. Under the first factor, the court must also determine whether the use is commercial. In *Acuff–Rose*, the Supreme Court clarified that a finding of commercial use weighs against, but does not preclude, a determination of fairness. *See Acuff–Rose*, 510 U.S. at 584, 114 S.Ct. 1164.

■ 6. If a use is non-commercial, the plaintiff bears the burden of showing a meaningful likelihood that it would adversely affect the potential market for the copyrighted work if it became widespread. *See Sony*, 464 U.S. at 451, 104 S.Ct. 774.

7. Although downloading and uploading MP3 music files is not paradigmatic commercial activity, it is also not personal use in the traditional sense. Plaintiffs have not shown that the majority of Napster users download music to sell—that is, for profit. However, given the vast scale of Napster use among anonymous individuals, the court finds that downloading and uploading MP3 music files with the assistance of Napster are not private uses. At the very least, a host user sending a file cannot be said to engage in a personal use when distributing that file to an anonymous requester. Moreover, the fact that Napster users get for free something they would ordinarily have to buy suggests that they reap economic advantages from Napster use. *See Sega Enters. Ltd. v. MAPHIA*, 857 F.Supp. 679, 687 (N.D.Cal.1994) ("*Sega I*") (holding that copying to save users expense of purchasing authorized

copies has commercial character and thus weighs against finding of fair use); *cf. American Geophysical Union v. Texaco, Inc.,* 60 F.3d 913, 922 (2d Cir.1994) (holding that for-profit enterprise which made unauthorized copies of scholarly articles to facilitate scientific research reaped indirect economic advantage from copying and, hence, that copying constituted commercial use).

8. The court finds that the copyrighted musical compositions and sound recordings are creative in nature; they constitute entertainment, which cuts against a finding of fair use under the second factor. *See Harper & Row Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 563, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *Sega I,* 857 F.Supp. at 687; *Playboy Enters., Inc. v. Frena,* 839 F.Supp. 1552, 1558 (M.D.Fla.1993) (citing *In re New Era Publications Int'l v. Carol Publ'g,* 904 F.2d 152, 157–58 (2d Cir.), *cert. denied,* 498 U.S. 921, 111 S.Ct. 297, 112 L.Ed.2d 251 (1990)).

9. With regard to the third factor, it is undisputed that downloading or uploading MP3 music files involves copying the entirety of the copyrighted work. The Ninth Circuit held prior to *Sony* that "wholesale copying of copyrighted material precludes application of the fair use doctrine." *Marcus v. Rowley,* 695 F.2d 1171, 1176 (9th Cir.1983). Even after *Sony,* wholesale copying for private home use tips the fair use analysis in plaintiffs' favor if such copying is likely to adversely affect the market for the copyrighted material. *See Sony,* 464 U.S. at 449–50, 456, 104 S.Ct. 774.

10. The fourth factor, the effect on the potential market for the copyrighted work, also weighs against a finding of fair use. Plaintiffs have produced evidence that Napster use harms the market for their copyrighted musical compositions and sound recordings in at least two ways. First, it reduces CD sales among college students. *See* Jay Rep. at 4, 18; *cf.* Fine Rep. at 1. Second, it raises barriers to plaintiffs' entry into the market for the digital downloading of music. *See* Teece Rep. at 12–18.

■ 11. Defendant asserts several potential fair uses of the Napster service—including sampling, space-shifting, and the authorized distribution of new artists' work. Sampling on Napster is not a personal use in the traditional sense that courts have recognized—copying which occurs within the household and does not confer any financial benefit on the user. *See, e.g., Sony,* 464 U.S. at 423, 449–50, 104 S.Ct. 774. Instead, sampling on Napster amounts to obtaining permanent copies of songs that users would otherwise have to purchase; it also carries the potential for viral distribution to millions of people. Defendant ignores critical differences between sampling songs on Napster and VCR usage in *Sony.* First, while "time-shifting [TV broadcasts] merely enables a viewer to see ... a work which he ha[s] been invited to witness in its entirety free of charge," plaintiffs in this action almost always charge for their music—even if it is downloaded song-by-song. *Sony,* 464 U.S. at 449–50, 104 S.Ct. 774; *see e.g.,* Conroy Dec. ¶ 9; Eisenberg Dec. ¶ 16. They only make promotional downloads available on a highly restricted basis. *See* Conroy Dec. ¶ 9–17; Cottrell Dec. ¶ 15; Eisenberg Dec. ¶ 13; Kenswil Dec. ¶ 12; Vidich Dec. ¶¶ 7(d), 8. Copyright owners also earn royalties from streamed song samples on retail websites like Amazon.com. *See* Lambert Reply Dec. ¶ 3. Second, the majority of VCR purchasers in *Sony* did not distribute taped television broadcasts, but merely enjoyed them at home. *See id.* at 423, 104 S.Ct. 774. In contrast, a Napster user who downloads a copy of a song to her hard drive may make that song available to millions of other individuals, even if she eventually chooses to purchase the CD. So-called sampling on Napster may quickly facilitate unauthorized distribution at an exponential rate.

Defendant's argument that using Napster to sample music is akin to visiting a free listening station in a record store, or listening to song samples on a retail web-

site, fails to convince the court because Napster users can *keep* the music they download. Whether or not they decide to buy the CD, they still obtain a permanent copy of the song. In contrast, many retail sites only offer thirty-to-sixty-second samples in streaming audio format, *see* Lambert Reply Dec. ¶ 2, and promotional downloads from the record company plaintiffs are often "timed-out." *See* Cottrell Dec. ¶ 15; Eisenberg Dec. ¶ 13; Kenswil Dec. ¶ 12; Vidich Dec. ¶¶ 7(d), 8.

The global scale of Napster usage and the fact that users avoid paying for songs that otherwise would not be free militates against a determination that sampling by Napster users constitutes personal or home use in the traditional sense.[18]

12. Even if the type of sampling supposedly done on Napster were a non-commercial use, plaintiffs have demonstrated a substantial likelihood that it would adversely affect the potential market for their copyrighted works if it became widespread. *See Sony*, 464 U.S. at 451, 104 S.Ct. 774. Plaintiffs claim three general types of harm: a decrease in retail sales, especially among college students; an obstacle to the record company plaintiffs' future entry into the digital downloading market; and a social devaluing of music stemming from its free distribution. With regard to sampling, twenty-one percent of the Jay survey respondents indicated that Napster helps them decide what music to purchase. *See* Jay Rep., Tbl. 4. Nevertheless, Jay reached the overarching conclusion that the more songs Napster users download, the more likely they are to reveal that such use reduces their music buying. *See id.* at 4, 18. Jay's evidence suggests that sampling and building a free music library through unauthorized downloading are not mutually exclusive: it is likely that survey respondents who sample

are primarily direct infringers. Napster users—not the record companies—control the music selection, the amount and the timing of the sampling activity, and they may keep many songs after deciding not to purchase the entire CD.

Defendant maintains that sampling does not decrease retail music sales and may even stimulate them. To support this assertion, it relies heavily on the Fader Report, which concludes that consumers do not view MP3 files as perfect substitutes for CDs. *See* Lisi Dec. (Fader Rep.) ¶ 63. Fader cites a survey that he did not conduct for the assertion that "60% of online users who download free digital music do so to preview music before buying the CD." Fader Rep. ¶ 74. Examining the results of a different survey that he purportedly designed, but did not carefully supervise, he reports that about twenty-eight percent of Napster users indicate that their music purchases have increased since they began using the Napster software. *See id.* ¶ 43. For reasons explained in the court's evidentiary order, the Fader Report is unreliable and fails to rebut plaintiffs' showing of harm. Plaintiffs have demonstrated a meaningful likelihood that the activity defendant calls sampling actually decreases retail sales of their music.

13. Any potential enhancement of plaintiffs' sales due to sampling would not tip the fair use analysis conclusively in favor of defendant. Indeed, courts have rejected the suggestion that a positive impact on sales negates the copyright holder's entitlement to licensing fees or access to derivative markets. *See Ringgold v. Black Entertainment Television*, 126 F.3d 70, 81 n. 16 (2d Cir.1997) (noting that, even if allegedly infringing use of plaintiff's poster in television program increased poster sales, plaintiff retained right to li-

---

**18.** Defendant cites the Office of Technology Assessment ("OTA") report on home taping to bolster its misguided argument about the Audio Home Recording Act of 1992. *See infra* note 19. Plaintiffs note that the OTA Report expressly contemplates use by "a household and its normal circle of friends, rather than the public." Pl.'s Reply at 4 (citing U.S. Cong., OTA, *Copyright and Home Copying: Technology Challenges the Law*). Although this definition of home use does not control, it nevertheless suggests flaws in defendant's position.

censing fee); *DC Comics, Inc. v. Reel Fantasy, Inc.*, 696 F.2d 24, 28 (2d Cir.1982) (stating that speculated increase in plaintiff's comic book sales due to unauthorized use of Batman and Green Arrow figures on advertising flyers did not establish fair use defense as matter of law); *MP3.Com*, 92 F.Supp.2d at 352 (holding that allegedly positive impact on plaintiffs' prior market "in no way frees defendant to usurp a further market that directly derives from reproduction of [the] copyrighted works.").

The *MP3.Com* opinion is especially instructive. Although MP3.com's activities arguably stimulated CD sales, the plaintiffs "adduced substantial evidence that they ... [had] taken steps to enter [the digital downloading market]." *MP3.Com*, 92 F.Supp.2d at 352. The fourth factor thus weighed against a finding of fair use. Plaintiffs in the instant action similarly allege that Napster use impedes their entry into the online market. The record company plaintiffs have already expended considerable funds and effort to commence Internet sales and licensing for digital downloads. *See* Conroy Dec. ¶¶ 9–18; Cottrell Dec. ¶¶ 6–17; Eisenberg Dec. ¶¶ 9–22; Vidich Dec. ¶¶ 7–10. Plaintiffs' economic expert opined that the availability of free MP3 files will reduce the market for authorized, commercial downloading. *See* Teece Dec. at 14–18. This point is corroborated by the fact that all forty-nine

songs available for purchase on Sony's website can be obtained for free using Napster. *See* Eisenberg Dec. ¶ 16. If consumers choose to buy, rather than burn, entire CDs they are still more likely to obtain permanent copies of songs on Napster than buy them from Sony's site or listen to streamed samples at other online locations.

The court concludes that, even assuming the sampling alleged in this case is a non-commercial use, the record company plaintiffs have demonstrated a meaningful likelihood that it would adversely affect their entry into the online market if it became widespread. *See Sony*, 464 U.S. at 451, 104 S.Ct. 774. Moreover, it deprives the music publisher plaintiffs of royalties for individual songs. The unauthorized downloading of plaintiffs' music to sample songs would not constitute a fair use, even if it enhanced CD sales.

■ 14. The court is also unconvinced that *Sony* applies to space-shifting. Defendant erroneously relies on the Ninth Circuit's assertion, in a case involving an inapplicable statute, that space-shifting constitutes non-commercial personal use. *See Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072, 1079 (9th Cir.1999) (discussing the applicability of the Audio Home Recording Act of 1992 to the Rio MP3 player).[19]

---

19. Defendant's opposition brief opens with a perplexing argument. It cites *Recording Industry Association of America v. Diamond Multimedia Systems, Inc.*, 180 F.3d 1072, 1079 (9th Cir.1999), for the proposition that the Audio Home Recording Act of 1992, 17 U.S.C. §§ 1001–1010 ("AHRA"), immunizes the non-commercial use of Napster to space-shift music. The AHRA is irrelevant to the instant action. Neither the record company nor music publisher plaintiffs have brought claims under the AHRA; moreover, the Ninth Circuit did not hold in *Diamond Multimedia* that the AHRA covers the downloading of MP3 files.

*Diamond Multimedia* involved a suit under the AHRA by the Recording Industry Association of America ("RIAA") to enjoin the manufacture and distribution of the Rio portable music player—a hand-held device that can

receive, store, and re-play MP3 files. *See Diamond Multimedia*, 180 F.3d at 1074. The Ninth Circuit held that the Rio player is not a digital audio recording device subject to the AHRA's restrictions. *See id.* at 1081. Nor are computers and their hard drives digital audio recording devices. *See id.* at 1078. The *Diamond Multimedia* court *did* opine that making copies with the Rio to space-shift, or make portable, files already on a user's hard drive constitutes "paradigmatic noncommercial personal use entirely consistent with the purposes of the Act [i.e. the facilitation of personal use]." *Id.* at 1079. However, this dicta is of limited relevance. Because plaintiffs have not made AHRA claims, the purposes and legislative history of the AHRA do not govern the appropriateness of a preliminary injunction against Napster, Inc. Furthermore, as explained below, the court is not persuaded that space-shifting constitutes a

Defendant also implies that space-shifting music is sufficiently analogous to time-shifting television broadcasts to merit the protection of *Sony*. According to the gravely flawed Fader Report, space-shifting—like time-shifting—leaves the value of the copyrights unscathed because it does not displace sales. *See* Fader Rep. ¶ 77; *Sony*, 464 U.S. at 421, 104 S.Ct. 774 (concluding that plaintiffs did not prove that time-shifting created any likelihood of harm). Defendant again cites Fader for the statistic that seventy percent of Napster users at least sometimes engage in space-shifting. *See* Lisi Dec. (Fader Rep.) ¶ 77. In contrast, Jay opined that approximately forty-nine percent of her college-student survey respondents previously owned less than ten percent of the songs they downloaded, and about sixty-nine percent owned less than a quarter. *See* Jay Rep. at 4, 21 & Tbl. 7. The court has already held that the Jay Report bears greater indicia of reliability than the Fader Report. Moreover, under either analysis, the instant matter is distinguishable from *Sony* because the Supreme Court determined in *Sony* that time-shifting represented the *principal*, rather than an occasional use of VCRs. *See Sony*, 464 U.S. at 421, 104 S.Ct. 774.

15. Defendant argues that, if space-shifting is deemed a fair use, the staple article of commerce doctrine precludes liability for contributory or vicarious infringement. Under *Sony*, the copyright holder cannot extend his monopoly to products "capable of substantial noninfringing uses." *Sony*, 464 U.S. at 442, 104 S.Ct. 774. Defendant fails to show that space-shifting constitutes a commercially significant use of Napster. Indeed, the most credible explanation for the exponential growth of traffic to the website is the vast array of free MP3 files offered by other users—*not* the ability of each individual to space-shift music she already owns. Thus, even if space-shifting is a fair use, it is not substantial enough to preclude liability under the staple article of commerce doctrine. *See Cable/Home Communication Corp. v. Network Prods., Inc.*, 902 F.2d 829, 846 (11th Cir.1990) (affirming finding of contributory infringement where defendant primarily promoted pirate computer chips and other devices capable of descrambling pay-TV broadcasts as infringement aids); *A&M Records v. General Audio Video Cassettes, Inc.*, 948 F.Supp. 1449, 1456 (C.D.Cal.1996) (rejecting *Sony* defense because counterfeiting was chief purpose of time-loaded cassettes that defendant sold).[20]

16. This court also declines to apply the staple article of commerce doctrine because, as paragraphs (D)(6) and (E)(2) of the legal conclusions explain, Napster exercises ongoing control over its service. In *Sony*, the defendant's participation did not extend past manufacturing and selling the VCRs: "[t]he only contact between Sony and the users of the Beta-

---

substantial, non-infringing use of the Napster service. The Ninth Circuit did not discuss the fair use doctrine in *Diamond Multimedia*.

This court denies defendant's request for judicial notice of the legislative history of the AHRA, filings in *Diamond Multimedia,* and certain other materials deemed irrelevant or inappropriate for judicial notice.

**20.** Relying on *Vault Corp. v. Quaid Software, Ltd.*, 847 F.2d 255 (5th Cir.1988), defendant argues that even *one* substantial non-infringing use precludes contributory liability. RAMKEY, one feature of Quaid's computer diskette, had an unobjectionable use because consumers could use it to make archival copies of Vault's anti-piracy software if Vault's program were inadvertently destroyed. Based on this one use, the Fifth Circuit held that there was no contributory copyright infringement, even though third parties *did* engage in direct infringement. *See id.* at 262. Other jurisdictions have disagreed with the *Vault* approach where the product's primary purpose is unlawful. *See Cable/Home Communication Corp.* 902 F.2d at 846; *General Audio Video*, 948 F.Supp. at 1456. A Fifth Circuit opinion does not bind this court. Moreover, even the Fifth Circuit declined to consider the legitimate functions of Copywrite, another feature of Quaid's product, because "without RAMKEY, Copywrite would have no commercial value." *Vault*, 847 F.2d at 264 n. 16. The Napster service arguably has little commercial value without the availability of copyrighted popular music.

max ... occurred at the moment of sale." *Sony,* 464 U.S. at 438, 104 S.Ct. 774. Here, in contrast, Napster, Inc. maintains and supervises an integrated system that users must access to upload or download files. Courts have distinguished the protection *Sony* offers to the manufacture and sale of a device from scenarios in which the defendant continues to exercise control over the device's use. *See General Audio Video,* 948 F.Supp. at 1456–57 (finding *Sony* doctrine inapplicable to seller of blank tapes who "acted as a contact between his customers and suppliers of other material necessary for counterfeiting"); *RCA Records v. All–Fast Sys., Inc.,* 594 F.Supp. 335, 339 (S.D.N.Y.1984) (holding that defendant in position to control cassette-copying machine could not invoke *Sony* ); *see also Columbia Pictures Indus., Inc. v. Aveco, Inc.,* 800 F.2d 59, 62 & n. 3 (3d Cir.1986) (holding that business which rented rooms where public viewed copyrighted video cassettes engaged in contributory infringement, even when it was not source of cassettes). Napster, Inc.'s facilitation of unauthorized file-sharing smacks of the contributory infringement in these cases, rather than the legitimate conduct of the VCR manufacturers. Given defendant's control over the service, as opposed to mere manufacturing or selling, the existence of a potentially unobjectionable use like space-shifting does not defeat plaintiffs' claims.

■ 17. Nor do other potential non-infringing uses of Napster preclude contributory or vicarious liability. Defendant claims that it engages in the authorized promotion of independent artists, ninety-eight percent of whom are not represented by the record company plaintiffs. *See* Def.'s Opp. at 10 (citing, *inter alia,* Krause Dec. ¶ 16), 27. However, the New Artist Program may not represent a substantial or commercially significant aspect of Napster. The evidence suggests that defendant initially promoted the availability of songs by major stars, as opposed to "page

after page of unknown artists." *See* 1 Frackman Dec., Exh. C (Parker Dep.) at 104:16–105:10, Exh. 235. Its purported mission of distributing music by artists unable to obtain record-label representation appears to have been developed later.

Other facts point to the conclusion that the New Artists Program was an afterthought, not a major aspect of the Napster business plan. Former CEO Eileen Richardson claimed in her deposition that she told the press Napster is not about known artists like Madonna. But, tellingly, discovery related to downloads by Napster executives reveals that Richardson's own computer contained about five Madonna files obtained using Napster. *See* 1 Frackman Dec., Exh. A (Richardson Dep.) at 238:2–240:25. Defendant did not launch the website aspect of its New Artist Program until *after* plaintiffs filed suit, and as recently as July 2000, bona fide new artists constituted a very small percentage of music available on Napster. *See* Krause Dec. ¶ 9, Exh. A; Olkin Reply Dec. ¶¶ 3–5; Hausman Reply Dec. ¶¶ 3–6.

In any event, Napster's primary role of facilitating the unauthorized copying and distribution established artists' songs renders *Sony* inapplicable. *See General Audio Video,* 948 F.Supp. at 1456–57; *RCA Records,* 594 F.Supp. at 339.

18. Plaintiffs do not object to *all* of the supposedly non-infringing uses of Napster. They do not seek an injunction covering chat rooms or message boards, the New Artist Program or any distribution authorized by rights holders. *See* Pl.'s Reply at 19. Nor do they seek to enjoin applications unrelated to the music recording industry.[21] *See id.* Because plaintiffs do not ask the court to shut down such satellite activities, the fact that these activities may be non-infringing does not lessen plaintiffs' likelihood of success. The court therefore finds that plaintiffs have established a reasonable probability of proving third-party infringement.

---

**21.** For example, defendant notes that its technology might be used for collaborative work-

ing relationships in business, education, and research. *See* Def's Opp. at 9 n. 10.

### D. Contributory Copyright Infringement

**1.** Once they have shown direct infringement by Napster users, plaintiffs must demonstrate a likelihood of success on their contributory infringement claim. A contributory infringer is "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Gershwin Publ'g Corp. v. Columbia Artists Management, Inc.,* 443 F.2d 1159, 1162 (2d Cir.1971); *see Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 264 (9th Cir.1996). Courts do not require actual knowledge; rather, a defendant incurs contributory copyright liability if he has reason to know of the third party's direct infringement. *See Cable/Home Communication Corp.,* 902 F.2d at 846; *Sega Enter. Ltd. v. MAPHIA,* 948 F.Supp. 923, 933 (N.D.Cal.1996) ("*Sega II*").

**2.** Plaintiffs present convincing evidence that Napster executives actually knew about and sought to protect use of the service to transfer illegal MP3 files. For example, a document authored by co-founder Sean Parker mentions the need to remain ignorant of users' real names and IP addresses "since they are exchanging *pirated* music." 1 Frackman Dec., Exh. C (Parker Dep.) at 160:1–162:14, Exh. 254 at SF00100 (emphasis added). The same document states that, in bargaining with the RIAA, defendant will benefit from the fact that "we are not just making *pirated* music available but also pushing demand." *Id.* at 160:1–162:14, Exh. 254 at SF00102 (emphasis added). These admissions suggest that facilitating the unauthorized exchange of copyrighted music was a central part of Napster, Inc.'s business strategy from the inception.

Plaintiff also demonstrate that defendant had actual notice of direct infringement because the RIAA informed it of more than 12,000 infringing files. *See* Creighton 12/3/99 Dec., Exh. D. Although Napster, Inc. purportedly terminated the users offering these files, the songs are still available using the Napster service, as are the copyrighted works which the record company plaintiffs identified in Schedules A and B of their complaint. *See* Creighton Supp. Dec. ¶¶ 3–4.

**3.** The law does not require actual knowledge of specific acts of infringement. *See Gershwin,* 443 F.2d at 1163 (holding that general knowledge that third parties performed copyrighted works satisfied knowledge element of contributory infringement); *Sega I,* 857 F.Supp. at 686–87 (concluding that plaintiffs established knowledge element, even though electronic bulletin board company did not know exactly when infringing video games would be uploaded to or downloaded from bulletin board). Accordingly, the court rejects defendant's argument that titles in the Napster directory cannot be used to distinguish infringing from non-infringing files and thus that defendant cannot know about infringement by any particular user of any particular musical recording or composition. *See* Lisi Dec. (Tygar Rep.) at 29 (offering expert opinion about difficulty of identifying copyrighted works by file name); Lars Ulrich Dep. at 36:16–37:2 (stating that in the past he did not object to individuals taping his band's concerts and making MP3 files of such concerts available via Napster); Sanders Dep. at 24:23–29:13 (discussing complex process for determining chain of title for copyright owners).[22]

4. Defendant's reliance on *Religious Technology Center v. Netcom On–Line Communication Services, Inc.,* 907 F.Supp. 1361 (N.D.Cal.1995), does not alter the court's conclusion that plaintiffs have a reasonable likelihood of proving contributory liability. The cited passage from *Religious Technology Center* states:

> Where a BBS [bulletin board service] operator cannot reasonably verify a

---

**22.** MP3 files do not bear a copyright notice or watermark. *See* Lisi Dec. (Tygar Rep.) at 37–47. More than one artist may use a song title; and multiple recordings of the same work may carry different authorizations. *See id.* at 29.

claim of infringement, either because of a possible fair use defense, the lack of copyright notices on the copies, or the copyright holder's failure to provide the necessary documentation to show that there is likely infringement, the operator's lack of knowledge will be found reasonable and there will be no liability for contributory infringement for allowing the continued distribution of the works on its system.

*Id.* at 1374. This language is dicta because the plaintiffs in *Religious Technology Center* raised a genuine issue of material fact regarding knowledge. More importantly, Napster is not an Internet service provider that acts as a mere conduit for the transfer of files. *See A & M Records v. Napster, Inc.,* 2000 WL 573136, at *6, 8 (N.D.Cal. May 12, 2000). Rather, it offers search and directory functions specifically designed to allow users to locate music, the majority of which is copyrighted. *See id.* at *6. Thus, even if dicta from another federal district court were binding, *Religious Technology Center* would not mandate a determination that Napster, Inc. lacks the knowledge requisite to contributory infringement.

5. At the very least, defendant had constructive knowledge of its users' illegal conduct. Some Napster executives boast recording industry experience, *see* 1 Frackman Dec. (Ricardson Dep.), Exh. 129 at ER00138, and defendant does not dispute that it possessed enough sophistication about intellectual property laws to sue a rock band that copied its logo. *See* 2 Frackman Dec., Exh. M (online news article about court proceedings to halt The Offspring's use of Napster logo).[23] The evidence indicates that Napster executives downloaded infringing material to their own computers using the service and promoted the website with screen shots listing infringing files. *See* 2 Frackman Dec., Exh. D (Brooks Dep.) at 51:8–24, 54:25–56:11, Exh. 64 at 2–4, Exh. 126 at 002260, 002263; 1 Frackman Dec., Exh. A (Richardson Dep.) at 20:5–22:10, 25:2–26:1; Exh. C (Parker Dep.) at 70:14–16, Exh. 230, ¶ 3–5; Exh. B (Fanning Dep.), Exhs. 174–76. Such conduct satisfies the objective test for constructive knowledge—defendant had reason to know about infringement by third parties. *See Cable/Home Communication Corp.,* 902 F.2d at 846.[24]

6. Plaintiffs have also shown that defendant materially contributed to the infringing activity. In *Fonovisa,* the owners of copyrights for musical recordings stated a contributory infringement claim against the operators of a swap meet at which independent vendors sold counterfeit recordings. *See Fonovisa,* 76 F.3d at 264. The Ninth Circuit held the copyright owners' allegations were "sufficient to show material contribution" because "it would have been difficult for the infringing activity to take place in the massive quantities alleged without the support services provided by the swap meet." *Id.* According to plaintiffs in the instant action, "Napster is essentially an Internet swap meet—more technologically sophisticated but in many

---

**23.** Defendant objects to Exhibit M to the Frackman Declaration because press articles constitute hearsay and statements reported within them are double hearsay. *See* Def.'s Objections to Pl.'s Evidence at 12. However, defendant does not appear to dispute the truth of the matter asserted—that Napster, Inc. sued The Offspring for violating its intellectual property rights. Indeed, defendant's second ground for objecting indicates that it admits such a lawsuit was filed. *See id.* If the exhibit should be excluded because the suit involved trademark, rather than copyright, defendant effectively concedes that it brought a trademark action.

**24.** This finding also puts an end to defendant's persistent attempts to invoke the protection of the Digital Millennium Copyright Act, 17 U.S.C. § 512. In its opposition brief, Napster, Inc. attempts to persuade the court that subsection 512(d) provides an applicable safe harbor. However, this subsection expressly excludes from protection any defendant who has "[a]ctual knowledge that the material or activity is infringing," § 512(d)(1)(A), or "is aware of facts or circumstances from which infringing activity is apparent." § 512(d)(1)(B). Defendant has failed to persuade this court that subsection 512(d) shelters contributory infringers.

ways indistinguishable from the [defendant] in *Fonovisa*." Pl.'s Br. at 6. The court largely agrees with this characterization.

Unlike the swap meet vendors, Napster users offer their infringing music for free. However, defendant's material contribution is still analogous to that of the swap meet in *Fonovisa*. The swap meet provided support services like parking, booth space, advertising, and clientele. *See Fonovisa*, 76 F.3d at 264. Here, Napster, Inc. supplies the proprietary software, search engine, servers, and means of establishing a connection between users' computers. Without the support services defendant provides, Napster users could not find and download the music they want with the ease of which defendant boasts.

Several contributory infringement cases involving online services are in accord with the court's conclusion that defendant materially contributes to the infringing activity. For example in *Sega II*, an electronic bulletin board service acted as a central depository for unauthorized copies of computer games and materially contributed to infringement because it provided software, hardware, and phone lines needed for uploading and downloading copyrighted material. *See Sega II*, 948 F.Supp. at 933. Similarly, in *Religious Technology Center*, a case defendant ignores when convenient, a court in this district stated that an Internet access provider is not a mere landlord; rather, it exerts control akin to a radio station replaying infringing broadcasts. *See Religious Tech. Ctr.*, 907 F.Supp. at 1375 (holding that plaintiffs raised genuine issue of material fact as to service provider's substantial participation).

Defendant marshals two district court cases in an attempt to rebut plaintiffs' argument about material contribution. *See Intellectual Reserve, Inc. v. Utah Lighthouse Ministry*, 75 F.Supp.2d 1290, 1293 (D.Utah 1999) (holding that posting links to infringing websites did not contribute to infringement by those websites' operators); *Bernstein v. JC Penney, Inc.*, 50 U.S.P.Q.2d 1063, 1998 WL 906644 (C.D.Cal.1998) (paraphrasing defendant's apparently successful argument that "multiple linking does not constitute substantial participation in any infringement where the linking website does not mention the fact that Internet users could, by following the links, find infringing material on another website"). The *Bernstein* court offered no reasoning for its dismissal of the complaint. Neither case is factually apposite, for Napster provides its users with much more than hyperlinking; Napster is an integrated service designed to enable users to locate and download MP3 music files. In keeping with its view that Napster, Inc. plays a more active role in facilitating file-sharing than an Internet service provider acting as a passive conduit, this court finds it probable that defendant materially contributed to unlawful conduct.

7. Because they have made a convincing showing with regard to both the knowledge and material contribution elements, plaintiffs have established a reasonable likelihood of success on their contributory infringement claims.

### E. *Vicarious Copyright Infringement*

1. Even in the absence of an employment relationship, a defendant incurs liability for vicarious copyright infringement if he "has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities." *Fonovisa*, 76 F.3d at 262 (quoting *Gershwin*, 443 F.2d at 1162).

2. In *Fonovisa*, the swap meet operator satisfied the first element of vicarious liability because it had the right to terminate vendors at will; it also controlled customers' access and promoted its services. *See id.* Although Napster, Inc. argues that it is technologically difficult, and perhaps infeasible, to distinguish legal and illegal conduct, plaintiffs have shown that defendant supervises Napster use. Indeed, Napster, Inc. itself takes pains to inform the court of its improved methods of blocking users about whom rights holders complain. *See* Def.'s Opp. Br. at 19

(citing Kessler Dec. ¶ 22), 33 (citing Kessler Dec. ¶¶ 23–24). This is tantamount to an admission that defendant can, and sometimes does, police its service. *See Religious Tech. Ctr.*, 907 F.Supp. at 1376 (concluding that evidence that Internet access provider acted to suspend subscribers' accounts and could delete specific postings raised genuine issue of material fact about vicarious liability).

Moreover, a defendant need not exercise its supervisory powers to be deemed capable of doing so. *See Gershwin*, 443 F.2d at 1161–63. The court therefore finds that Napster, Inc. has the right and ability to supervise its users' infringing conduct.

3. Plaintiffs have shown a reasonable likelihood that Napster, Inc. has a direct financial interest in the infringing activity. Citing several non-governing cases from other districts, they contend that direct financial benefit does not require earned revenue, so long as the defendant has economic incentives for tolerating unlawful behavior. For instance, in *Major Bob Music v. Stubbs*, 851 F.Supp. 475 (S.D.Ga. 1994), a bar derived direct financial benefit from infringing musical performances on its premises. The court noted that "an enterprise is considered to be 'profit-making' even if it never actually yields a profit." *Id.* at 480; *see also Walden Music, Inc. v. C.H.W., Inc.*, 1996 WL 254654, at *5 (D.Kan.1996) ("The fact that defendant' entrepreneurial enterprise is not profiting is not a defense to the plaintiffs' copyright infringement claims."); *Broadcast Music, Inc. v. Hobi, Inc.*, 1993 WL 404152, at *3 (M.D.La.1993) (holding defendant vicariously liable because it operated with goal of making a profit, even though it did not actually make one), *aff'd* 20 F.3d 1171 (5th Cir.1994).

Although Napster, Inc. currently generates no revenue, its internal documents state that it "will drive [sic] revenues directly from increases in userbase." 1

Frackman Dec. (Parker Dep.), Exh. 251.[25] The Napster service attracts more and more users by offering an increasing amount of quality music for free. *See, e.g,* 1 Frackman Dec., Exh. A (Richardson Dep.) at 112:18–113:2. It hopes to "monetize" its user base through one of several generation revenue models noted in the factual findings.

This is similar to the type of direct financial interest the Ninth Circuit found sufficient for vicarious liability in *Fonovisa*, where the swap meet's revenues flowed directly from customers drawn by the availability of music at bargain basement prices. *See Fonovisa*, 76 F.3d at 263–64; *see also Famous Music Corp. v. Bay State Harness Horse Racing and Breeding Ass'n*, 554 F.2d 1213, 1214 (1st Cir.1977) (holding racing ·association vicariously liable for infringing broadcast of music to entertain race-goers "when they were not absorbed in watching the races"); *Playboy Enters., Inc. v. Webbworld, Inc.*, 968 F.Supp. 1171, 1177 (N.D.Tex.1997) (holding defendant vicariously liable because "plaintiff's photographs enhanced the attractiveness of the Neptics' website to potential customers"); *Polygram Int'l Publ'g, Inc. v. Nevada/Tig, Inc.*, 855 F.Supp. 1314, 1332 (D.Mass.1994) (finding that music used to cultivate trade show attendees' interest provided direct financial benefit to trade show).

Napster, Inc.'s cursory discussion of the second element of vicarious liability does little to rebut this line of reasoning. Relying on *Religious Technology Center*, 907 F.Supp. at 1376–77, defendant maintains that it does not have a policy of ignoring infringement, and that even if it did, its non-infringing uses lure consumers to its service. The latter contention, for which it provides no factual support, does not square with its prediction that "the requested injunction would effectively put

---

**25.** Although defendant appears to object to Exhibit 251 to the Parker Deposition, it does not assert any grounds for doing so. *See* Def.'s Objections to Pl.'s Evidence at 11. The court declines to speculate about defendant's reasons for objecting. Exhibit 251 is deemed admissible due to defendant's failure to make a proper objection.

Napster out of business." Def.'s Opp. Br. at 31. If many of defendant's commercially significant uses were non-infringing, an injunction limited to unlawful activity would not have such a dire impact. Defendant's representations about the primacy of its legitimate uses thus appear disingenuous. The ability to download myriad popular music files without payment seems to constitute the glittering object that attracts Napster's financially-valuable user base.

4. Plaintiffs has shown a reasonable likelihood of success on their vicarious infringement claims.

### F. *Defendant's First Amendment Challenge*

■ 1. According to Napster, Inc., the requested injunction would impose a prior restraint on its free speech, as well as that of its users and the unsigned artists that depend upon its service. This First Amendment argument centers on the fact that defendant offers an electronic directory, which does not itself contain copyrighted material. Directories have been accorded First Amendment protection. *See Princeton Community Phone Book, Inc. v. Bate,* 582 F.2d 706, 710–11 (3d Cir.) (holding that First Amendment affords as much protection to listing in directory as it does to newspaper advertisement), *cert. denied,* 439 U.S. 966, 99 S.Ct. 454, 58 L.Ed.2d 424 (1978).

■ 2. Although an overbroad injunction might implicate the First Amendment, free speech concerns "are protected by and coextensive with the fair use doctrine." *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.,* 166 F.3d 65, 74 (2d Cir. 1999); *Religious Tech. Ctr.,* 907 F.Supp. at 1377 (stating that, where otherwise appropriate, imposing liability for copyright infringement does not necessarily create First Amendment concerns because the fair use defense encompasses this issue). This court has already determined that plaintiffs do not seek to enjoin any fair uses of the Napster service that are not

completely contrived or peripheral to its existence.

3. The parties dispute the extent to which infringing and non-infringing aspects of the service are separable. Napster, Inc.'s interim CEO Hank Barry and Vice President of Engineering Edward Kessler both opine that the requested injunction would have the practical effect of compelling defendant to exclude all songs from its system, including those which plaintiffs do not own. *See* Barry Dec. ¶ 13; Kessler Dec. ¶ 39. In this view, the injunction would destroy the Napster service, or if the service did not shut down completely, forcibly supplant peer-to-peer file-sharing with a model under which defendant dictated the content. *See* Kessler Dec. ¶ 39. Barry avers that, as a result of the injunction, Napster would lose its competitive edge *vis-a-vis* similar services. *See* Barry Dec. ¶ 13.

In contrast, plaintiffs contend that Napster's New Artist Program, message boards, chat rooms, and file-sharing applications for business and scientific research would remain viable if the court granted the requested relief. *See* Pl.'s Reply at 19; Daniel Farmer Dec. ¶¶ 3–4. Plaintiffs expert Daniel Farmer suggests several potentially viable methods of limiting the Napster service to music files authorized for sharing. First, defendant could compile a database of authorized music and then write a software program to read the files on users' hard drives when they log-on to the Napster service. The program would compare those file names with the authorized list, and only those files that matched could be uploaded onto Napster. *See* Farmer Dec. ¶ 3. Alternatively, defendant could write a software program that prevented users from successfully searching for file names excluded from the authorized list. *See id.*

In the event that Napster, Inc. cannot separate the infringing and non-infringing aspects of its service, its First Amendment argument still fails. Courts will not sustain a First Amendment challenge where

the defendant entraps itself in an "all-or-nothing predicament." *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1406 (9th Cir.) (enjoining entire book that included parody in style of Dr. Seuss poem because defendant proceeded with book production after onset of litigation), *cert. dismissed,* 521 U.S. 1146, 118 S.Ct. 27, 138 L.Ed.2d 1057 (1997). Even if it is technologically impossible for Napster, Inc. to offer such functions as its directory without facilitating infringement, the court still must take action to protect plaintiffs' copyrights. *See, e.g., Orth–O–Vision, Inc. v. Home Box Office,* 474 F.Supp. 672, 686 n. 14 (S.D.N.Y.1979).

## G. *Misuse of Copyright Defense*

 1. Defendant essentially raises an antitrust argument as an equitable defense against the preliminary injunction motion. Under the rubric of misuse of copyright, Napster, Inc. argues that plaintiffs seek to aggrandize their monopoly beyond the scope of their copyrights by (1) restricting the flow of unsigned artists' music, which competes with their own, and (2) controlling the distribution of music over the Internet. Alleged antitrust violations by a copyright plaintiff generally do not afford a valid defense against an infringement action and ought not to dissuade a court from granting injunctive relief. *See* 4 *Nimmer on Copyright* § 13.09[A], at 13–286 (citing, *inter alia, Orth–O–Vision,* 474 F.Supp. at 680).

2. Furthermore, most of the cases defendant cites deal with improper attempts to enlarge a copyright monopoly through restricted or exclusive licensing. *See, e.g., Practice Management Info. Corp. v. American Med. Ass'n,* 121 F.3d 516, 521 (9th Cir.) (1997), *as amended* 133 F.3d 1140 (9th Cir.1998) (finding licensing agreement precluding use of competitor's products to be misuse), *and cert. denied*

522 U.S. 933, 118 S.Ct. 339, 139 L.Ed.2d 263 (1997); *see also, e.g., Alcatel USA, Inc. v. DGI Tech., Inc.,* 166 F.3d 772, 792–95 (overturning district court's rejection of misuse defense based on licensing agreement allowing plaintiff to gain control over uncopyrighted products), *reh'g and reh'g en banc denied,* 180 F.3d 267 (5th Cir. 1999); *Lasercomb Am., Inc. v. Reynolds,* 911 F.2d 970, 978–79 (4th Cir.1990) (concluding that exclusive licensing clause inhibiting licensees from developing own products constituted misuse). Plaintiffs have granted no licenses to defendant, let alone impermissibly restrictive ones. *See* Conroy Dec. ¶ 4; Cottrell Dec. ¶ 5; Eisenberg Dec. ¶ 21; Kenswil Dec. ¶ 15; Vidich Dec. ¶ 8; Stoller Dec. ¶ 11.

3. Accordingly, this court rejects the misuse of copyright defense.

## H. *Waiver*

 1. ·Napster, Inc. also avers that plaintiffs waived their entitlement to copyright protection because (a) they hastened the proliferation of MP3 files on the Internet, and (b) they plan to enter the market for digital downloading themselves. These arguments are unavailing.

Defendant has submitted deposition excerpts related to the record company plaintiffs' business dealings with Internet and software companies that provide ripping software, custom CDs,[26] and players capable of playing unencrypted MP3 files.[27] *See, e.g.,* 1 Pulgram Dec., Exh. A (Conroy Dep.) at 51:8–52:16, Exh. B (Cottrell Dep.) at 141:10–142:142. None of plaintiffs' online partners is a party to this action. But at least one plaintiff—Sony— sells a device capable of playing downloaded MP3 files, regardless of whether the distribution of such files is authorized.

---

**26.** Custom CDs can be created using a CD burner, a device that allows consumers to convert MP3 files from a computer hard drive to CD format. *See, e.g.,* 1 Pulgram Dec., Exh. A (Conroy Dep.) at 14:10–17.

**27.** Player software enables consumers to play MP3 files. Such software is available on the Internet, possibly free of charge, and may be part of the bundled software sold by PC manufacturers. *See, e.g.,* 1 Pulgram Dec., Exh. A (Conroy Dep.) at 14:21–17:12.

*See id.,* Exh. E (Eisenberg Dep.) at 44:5–48:10, Exh. 220.

This limited evidence fails to convince the court that the record companies created the monster that is now devouring their intellectual property rights.[28] Although plaintiffs have not sued their business partners for contributory infringement, they typically have asked them to discourage unauthorized ripping and have made security part of their agreements. *See, e.g.,* Exh. A (Conroy Dep.) at 17:13–23, 18:22–19:6, 38:3–22, 51:8–14; Exh. B (Cottrell Dep.) at 135:24–136:7. Defendant fails to show that, in hastening the proliferation of MP3 files, plaintiffs did more than seek partners for their commercial downloading ventures and develop music players for files they planned to sell over the Inter-

net.[29] Nor did plaintiffs invite wholesale infringement when they distributed a small number of free MP3 files for promotional purposes, especially since many of these files automatically "timed-out." *See* Conroy Dec. ¶ 9–17; Cottrell Dec. ¶ 15; Eisenberg Dec. ¶ 13; Kenswil Dec. ¶ 12; Vidich Dec. ¶¶ 7(d), 8.

To support its waiver argument, defendant primarily cites inapposite cases involving implied licenses. *See, e.g., Effects Assocs., Inc. v. Cohen,* 908 F.2d 555, 559 (9th Cir.1990) (finding implied license where plaintiff created work at defendant's request and gave work to defendant with intent that defendant copy and distribute it), *cert. denied,* 498 U.S. 1103, 111 S.Ct. 1003, 112 L.Ed.2d 1086 (1991). The evidence here does not reveal the existence of

---

**28.** For example, such plaintiffs as BMG and Sony have entered into agreements with Listen.com, a site that provides links to CD-ripping applications. *See* Exh. A (Conroy Dep.) at 49:22–51:20, Exh. 295; Exh. E (Eisenberg Dep.) at 135:2–24. However, BMG representative Kevin Conroy stated in his deposition that BMG encourages its online partners "to provide only for authorized ripping" and that BMG has agreements with such sites "to legitimately and securely market, promote, and sell [BMG] artists' music." *Id.* at 43:20–24, 51:8–14.

In the case of Musicmaker.com, in which EMI owns an equity stake, consumers can *purchase* single tracks and have them burned into a custom CD. *See id.,* Exh. B (Cottrell Dep.) at 141:10–142:17. It is not clear that Musicmaker.com promotes the use of pirated music. Similarly, Universal has entered agreements related to commercial downloading with Real Jukebox, which the first phase of the Secure Digital Music Initiative ("SDMI") did not cover. *See id.,* Exh. F (Kenswil Dep.) at 54:8–56:25; *see also infra* note 31 (discussing SDMI specifications). Under its agreement with Universal, RealJukebox will become SDMI-compliant, but still will be able to play unencrypted files to the extent the SDMI specifications allow. Defendant provides no conclusive evidence that Universal has encouraged the use of Real Jukebox to play copyrighted music for which no authorization has been obtained.

Finally, Sony VAIO Music Clip appears to be a Sony product that facilitates the downloading, arrangement, storage, and playback of MP3, ATRAC3, or WAV files. However, while the VAIO Music Clip may not be able to

screen out unauthorized files, one advertisement promotes the *"secure* music download capability of the software" and indicates that consumers should *"purchase* the wave of titles for major artists and record labels that are soon to come" on music websites. *See id.,* Exh. E (Eisenberg Dep.) at 44:5–48:10, Exh. 220 (emphasis added).

**29.** An internal Universal document that mentions "superdistribution" constitutes the most compelling evidence of defendant's position. *See id.,* Exh. F (Kenswil Dep), Exh. 257 at U0866. "Superdistribution" means viral distribution through a chain of consumers and their friends. *See id.* at 45:1–4, 19–25. However, in his deposition, Lawrence Kenswil indicated that Universal envisioned a model of viral distribution in which consumers would pay for the product and permission of the rights holder would be obtained prior to transmission. *See id.* at 45:5–46:7. That such a system eventually might encompass some version of Napster does not demonstrate a waiver of plaintiffs' copyrights.

According to another internal Universal plan, the "[g]oal is not just to equal Napster et al, but to surpass them." *Id.,* Exh. 258 at U0840. Defendant argues that Universal intended to commandeer Napster for its own benefit. Yet the strategic plan repeatedly employs the word "secure"—emphasizing its *"secure* ... core technology" and referring to the "perceived attractiveness of *secure* content by users" as a barometer of success. *Id.* (emphasis added). Nowhere does this document state or imply that Universal planned to promote unrestricted downloading of its music for free.

an implied license; indeed, the RIAA gave defendant express notice that it objected to the availability of its members' copyrighted music on Napster. *See* Creighton 12/3/99 Dec., Exh. D.

### I. *Failure to Present Evidence of Copyright Registration*

■■■■ 1. Defendant argues that, to claim infringement of multiple works, plaintiffs must specify the works with particularity and provide proof of copyright registration. The cited statutory subsection, 17 U.S.C. section 411(a), provides with certain exceptions: "[N]o action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this title." 17 U.S.C. § 411(a); *see also Kodadek v. MTV Networks, Inc.,* 152 F.3d 1209, 1211 (9th Cir.1998). A copyright infringement claim consists of two elements: (a) ownership of a valid copyright, and (b) copying of original elements of the copyrighted work. *See Feist Publications, Inc. v. Rural Telephone Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991).

2. Napster, Inc. exaggerates the import of a non-governing case, *Cole v. Allen,* 3 F.R.D. 236, 237 (S.D.N.Y.1942). In *Cole,* the defendant allegedly copied episodes from six books. Cole failed to plead her infringement claim with sufficient particularity because she merely listed the books' titles without specifying which portions were copied. Here, plaintiffs have attached two schedules listing works allegedly infringed in their *entirety.* Schedule A includes proof of registration; Schedule B (works recorded before 1972) does not because this material is governed by state law. Thus, despite their claim that it would be burdensome or even impossible to identify all of the copyrighted music they own, plaintiffs have made at least a minimal effort to describe the works in suit.

3. Furthermore, in *Walt Disney Co. v. Powell,* 897 F.2d 565, 568 (D.C.Cir.1990), the D.C. Circuit allowed a permanent injunction covering works owned by the plaintiff but not in suit. The *Walt Disney* court found such a broad injunction appropriate where "liability has been determined adversely to the infringer, there has been a history of continuing infringement and a significant threat of future infringement remains." *Id.* Here, the evidence establishes that unauthorized sharing of plaintiffs' copyrighted music occurred on a massive scale in the past; Napster continues to be used to download and upload files illegally despite defendant's purportedly enhanced ability to terminate infringers; and the court anticipates a hemorrhage of plaintiffs' copyrighted material as users rush to obtain free music before trial. The courts therefore finds it necessary to issue an injunction covering both plaintiffs' copyrighted works in suit and those not yet named.

### J. *Irreparable Harm*

■■■ 1. Because plaintiffs have shown a reasonable likelihood of success on the merits of their contributory and vicarious copyright infringement claims, they are entitled to a presumption of irreparable harm. *See Micro Star,* 154 F.3d at 1109.

2. The court rejects defendant's contention that it has rebutted this presumption by demonstrating that any harm is *de minimis.* The declarations of record company executives, combined with the Teece Report, establish that plaintiffs have invested in the digital downloading market and that their business plans are threatened by a service that offers the same product for free. *See* Conroy Dec. ¶¶ 9–18; Cottrell Dec. ¶¶ 6–17; Eisenberg Dec. ¶¶ 9–22; Teece Rep. at 14–18; Vidich Dec. ¶¶ 7–10. Moreover, while the court recognizes the limitations of a survey that only targets college students, the Jay Report suggests the tendency of Napster use to suppress CD purchases, especially among heavy users. *See* Jay Rep. at 4, 18.

### K. *Balance of the Hardships*

■■■■ 1. The court cannot give much weight to defendant's lament that

the requested relief will put it out of business. *See Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1119 (9th Cir.1999). Although even a narrow injunction may so fully eviscerate Napster, Inc. as to destroy its user base [30] or make its service technologically infeasible, the business interests of an infringer do not trump a rights holder's entitlement to copyright protection. Nor does defendant's supposed inability to separate infringing and non-infringing elements of its service constitute a valid reason for denying plaintiffs relief or for issuing a stay. *See Dr. Seuss*, 109 F.3d at 1406.

Any destruction of Napster, Inc. by a preliminary injunction is speculative compared to the statistical evidence of massive, unauthorized downloading and uploading of plaintiffs' copyrighted works— as many as 10,000 files per second, by defendant's own admission. *See* Kessler Dec. ¶ 29. The court has every reason to believe that, without a preliminary injunction, these numbers will mushroom as Napster users, and newcomers attracted by the publicity, scramble to obtain as much free music as possible before trial.

2. Napster, Inc. contends that its service poses no harm to plaintiffs because future SDMI specifications will protect their music releases in both CD and downloadable formats.[31] Defendant purportedly intends to support SDMI-compliant formats when they become available. *See* Kessler Dec. ¶ 37. However, this argu-

---

**30.** Because the Napster service appears to enjoy a cult following, the court doubts that a preliminary injunction would destroy defendant's user base. If users switch to other services like Gnutella while Napster is temporarily enjoined, there is a reasonable likelihood that they will switch back, especially considering defendant's claim to offer more music and more efficient search tools than its competitors.

**31.** The Secure Digital Music Initiative, "SDMI," is a forum that brings together interested parties to develop technology specifications for protecting the distribution of digital media. *See* Kessler Dec. ¶ 36. Some time in the future, but no earlier than the end of the year 2000, SDMI will select certain specifications for content media, such as CDs and digital file formats. *See* 1 Pulgram Dec., Exh. N (Vidich Dep.) at 59:8–62:10. The first phase of SDMI covered portable physical devices, but still allowed these devices to play unencrypted files. *See* 1 Pulgram Dec., Exh. F (Kenswil Dep.) at 54:8–54:19.

Generally speaking, the next phase of SDMI will concern two forms of digital rights management technology: encryption and watermarking. *See* Kessler Dec. ¶¶ 35, 36; 1 Pulgram Dec., Exh. N (Vidich Dep.) at 59:8–62:10. Encryption codes files in a way that requires "keys," such as the consumer's hardware serial numbers, to access the files' content. *See* Kessler Dec. ¶ 36; 1 Pulgram Dec., Exh. N (Vidich Dep.) at 53:10–56:8. Encryption technology has limitations, however. For example, encrypted CDs will not function in existing CD players because the players will not be able to read them. *See* 1 Pulgram Dec., Exh. N (Vidich Dep.) at 52:21–53:2.

Thus, consumers will have to purchase new CD players to listen to encrypted CD music. *See id.* at 53:22–54:4. Also, encryption technology will provide only prospective protection because it will not affect existing discs. *See id.* 54:6–55:4.

Watermarking imbeds "bits" or inaudible marks on content media; future SDMI-compliant devices or software players will be able to read the presence or absence of those bits and control copying accordingly. *See* Pulgram Dec., Exh. N (Vidich Dep.) at 57:2–9; 59:8–62:10. One form of copy control will allow consumers to copy CDs onto their SDMI-compliant devices, but will prevent further copying or transmission over the Internet. *See id.* at 60:14–25; 61:11–62:10; Exh. 227 at TW 0556742. Some time in the future, but not before year's end, several record company plaintiffs intend to implement watermarking technology that complies with SDMI specifications. *See, e.g.,* Pulgram Dec., Exh. N (Vidich Dep.) at 59:8–62:10); Exh. B (Cottrell Dep.) at 99:24–101:4(EMI). However, watermarking technology also has limitations. For instance, the first phase of SDMI-compliant devices and popular digital music software like the Real Jukebox can play formats that do not contain watermarking. *See* Pulgram Dec., Exh. N (Vidich Dep. at 59:8–60:25), Exh. F (Kenswil Dep.) at 54:8–56:19. Finally, like encryption, watermarking only offers prospective copy protection; it will not affect existing media because (a) such media cannot be "queried" to determine if the copy is legitimate, and (b) only future SDMI-compliant players will be able to make that query. *See* 1 Pulgram Dec., Exh. N (Vidich Dep.) at 59:8–62:10.

ment suffers from two fatal flaws. First, assuming SDMI protections work, they will only affect plaintiffs' *new* releases; neither the copyrighted material in Schedules A and B of the complaint nor any other existing music that plaintiffs own will be covered. *See* 1 Pulgram Dec. (Vidich Dep.) at 54:6–55:4, 59:8–62:10. Second, because the SDMI specifications have not yet taken effect, they cannot shield plaintiffs from irreparable harm at this moment— the moment in which the preliminary injunction is sought. *See id.* at 59:8–62:10. A rights-friendly regime scheduled for implementation, at the earliest, by the end of 2000 does nothing to staunch the illegal flow of plaintiffs' copyrighted material over the Internet in the summer and autumn of this year.

3. Thus, even if the court were required to balance the hardships, which it is not because plaintiffs have raised serious questions and shown a strong likelihood of success on the merits, plaintiffs would prevail in their motion for a preliminary injunction.

## III. CONCLUSION

 For the foregoing reasons, the court GRANTS plaintiffs' motion for a preliminary injunction against Napster, Inc. Defendant is hereby preliminarily ENJOINED from engaging in, or facilitating others in copying, downloading, uploading, transmitting, or distributing plaintiffs' copyrighted musical compositions and sound recordings, protected by either federal or state law, without express permission of the rights owner. This injunction applies to all such works that plaintiffs own; it is not limited to those listed in Schedules A and B of the complaint.

Plaintiffs have shown persuasively that they own the copyrights to more than seventy percent of the music available on the Napster system. *See* Hausman Dec. ¶ 8. Because defendant has contributed to illegal copying on a scale that is without

precedent, it bears the burden of developing a means to comply with the injunction. Defendant must insure that no work owned by plaintiffs which neither defendant nor Napster users have permission to use or distribute is uploaded or downloaded on Napster. The court ORDERS plaintiffs to cooperate with defendant in identifying the works to which they own copyrights. To this end, plaintiffs must file a written plan no later than September, 5, 2000, describing the most expedient method by which their rights can be ascertained. The court also ORDERS plaintiffs to post a bond for the sum of $ 5,000,-000.00 to compensate defendant for its losses in the event that this injunction is reversed or vacated.[32]

IT IS SO ORDERED.

---

**32.** On July 26, 2000, the court ordered defendant to comply with the preliminary injunction by midnight on July 28, 2000; however, on July 28, a Ninth Circuit panel stayed the injunction. That same day, plaintiffs posted their bond.